# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| CITY OF GALLATIN,<br><br>　　　Plaintiff,<br><br>v.<br><br>GALLATIN DATA CENTERS, LLC,<br><br>　　　Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE NO. 3:24-CV-00868<br><br>JUDGE RICHARDSON |
| GALLATIN DATA CENTERS, LLC and PHOENIX DATA CENTER HOLDINGS, LLC<br><br>　　　Counter-Plaintiffs,<br><br>v.<br><br>CITY OF GALLATIN, and GALLATIN DEPARTMENT OF ELECTRICITY<br><br>　　　Counter-Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |

## MEMORANDUM OPINION

Pending before the Court is a Renewed Motion for Judgment on the Pleadings (Doc. No. 34, "Motion") filed by Plaintiff/Counter-Defendant, City of Gallatin, Tennessee ("City"). Via the Motion, the City seeks judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) on the grounds that as a matter of law, it is entitled both to specific performance (its own claim) and to dismissal of the counterclaims filed by Gallatin Data Centers, LLC ("GDC") and Phoenix Data Centers Holdings, LLC ("PDC") (collectively, "Counter-Plaintiffs"). Counter-

Plaintiffs filed a response in opposition to the Motion (Doc. No. 36, "Response"), whereafter the City filed a reply in support of the Motion (Doc. No. 40, "Reply").[1]

For the reasons provided herein, the Court will **DENY** the Motion.

---

[1] The City attempts to raise new arguments in its Reply and to that end attaches four exhibits to its Reply ("Exhibits"). The Sixth Circuit has consistently held that a reply brief is not a proper place to introduce arguments for the first time. *See Sanborn v. Parker*, 629 F.3d 554, 579 (6th Cir. 2010) ("We have consistently held, however, that arguments made to us for the first time in a reply brief are waived." (citing *Am. Trim, L.L.C. v. Oracle Corp.*, 383 F.3d 462, 477 (6th Cir. 2004))); *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) ("[W]e have found issues to be waived when they are raised for the first time in . . . replies to responses."). It logically follows, that a reply brief is also not the proper place to attach exhibits for consideration for the first time. *Cf Tankesly v. Centurion of Tennessee, LLC*, No. 1:23-CV-90-TAV-SKL, 2024 WL 4682699, at \*4 (E.D. Tenn. Nov. 5, 2024) ("Plaintiff's attempt to raise new arguments and present new proof to support [his motion] in his reply are improper." (citing *Scottsdale Ins. Co.*, 513 F.3d at 553 (noting that it is improper for a party to present new proof or raise new arguments in a reply, and that courts therefore treat arguments that a party raises for the first time in a reply as waived) (citation omitted))); *Bragg v. Staff*, No. 1:16-CV-1271, 2019 WL 5273761, at \*1, n.3 (W.D. Mich. July 23, 2019) ("A reply brief is not the place to present new evidence." (citing *Perkins v. Rock-Tenn Servs., Inc.*, 700 F. App'x 452, 460 (6th Cir. 2017); *Key v. Shelby Cnty.*, 551 F. App'x 262, 265 (6th Cir. 2014))), *report and recommendation adopted*, No. 1:16-CV-1271, 2019 WL 4409486 (W.D. Mich. Sept. 16, 2019); *Parks v. Hillsdale Cmty. Health Ctr.*, No. 1:98-CV-204, 1999 WL 893852, at \*2 (W.D. Mich. May 20, 1999) (declining to consider new evidence attached to a reply brief).
   Importantly, the Undersigned has previously explained the following:

> Despite the general rule, the Court realizes that *some* arguments are appropriately considered even if first raised in the movant's reply. Specifically, such an argument can (and should) be considered if it was raised in the non-movant's response to the motion, regarding an issue that the movant in all fairness should not have been expected to raise in its initial brief (since, after all, a movant is not required, and generally is not allowed sufficient briefing pages, to make a pre-emptive argument against every single point that might be made in the non-movant's response).

*Archambeault v. Wyndham Vacation Ownership, Inc.*, No. 3:20-CV-01044, 2021 WL 6496827, at \*5 n.14 (M.D. Tenn. July 14, 2021) (Richardson, J.). The Court will not belabor the point, but it has specifically determined that the Exhibits should have been filed with, and corresponding arguments should have been made, in the first brief. Therefore, the Court will not consider the new arguments nor the Exhibits that the City presented for the first time in its Reply when ruling on the Motion.

<u>FACTS AS ALLEGED IN GDC'S ANSWER AND THE AMENDED COUNTERCLAIMS</u>[2]

**A.      GDC's Purchase of the Property**

The City established the Gallatin Industrial Center and recorded restrictive covenants applicable to the Gallatin Industrial Center in Record Book 3912, page 566, Register's Office for Sumner County, Tennessee ("Restrictive Covenants"). (Doc. No. 31 at p. 6, ¶ 4;[3] Doc. No. 1-1 at ¶ 4). In or around February 2022, GDC began considering the Gallatin Industrial Center as a potential site for a new data center. (Doc. No. 31 at p. 7, ¶ 9). In or around March of 2022, GDC began discussing power needs for the new data center with the Gallatin Department of Electricity.[4] (*Id.* at p. 7, ¶ 11). "On April 20, 2022, Mark Kimbell of the Gallatin Department of Electricity signed a letter[5] promising that [the Gallatin Department of Electricity] would be able to handle

---

[2] The facts contained in this section come from the Answer filed by GDC and the counterclaims filed by Counter-Plaintiffs (Doc. No. 31, "GDC's Answer and Counter-Plaintiffs' Amended Counterclaims"). For purposes of the instant Motion and pursuant to the typical mechanisms of assessing motions under Federal Rule of Civil Procedure 12(c), the Court accepts the facts alleged in GDC's Answer and Counter-Plaintiffs' Amended Counterclaims as true. But the Court does not accept as true any legal conclusions (even if couched as facts). As for any representation that the Court is *not* accepting as true, the Court generally identifies it by qualifying it (as, for example, by "GDC alleges" or "Counter-Plaintiffs allege") to denote that it is not being taken as true but rather is set forth to indicate what GDC/Counter-Plaintiffs *claim* to be true. Throughout this Order, except as indicated in the next sentence, the Court forgoes any such qualifiers for any fact that it is accepting as true, stating those facts without qualification even with the awareness that any such alleged fact may ultimately prove false. Having said that, at times when assessing whether GDC/Counter-Plaintiffs have alleged factual matter sufficient to deny the Motion, the Court does point out that it is basing its assessment on the facts alleged in GDC's Answer and Counter-Plaintiffs' Amended Counterclaims; in that particular context, the Court does use the phrase "GDC alleges" or "Counter-Plaintiffs allege" to proceed the facts alleged, even though the Court is taking those facts as true for purposes of the Motion.

[3] Because Docket No. 31 (i.e., GDC's Answer and Counter-Plaintiffs' Amended Counterclaims) contains two sets of numeration for paragraphs (one set for the portion of the document that reflects GDC's Answer (Doc. No. 31 at pp 1-5) and one set for the portion of the document that reflects the Counterclaims (*id.* at pp. 6-22)), the Court—when citing to particular portions of Docket No. 31—will cite to both the page number and the paragraph number being referred to on the specific page number.

[4] "The Gallatin Department of Electricity is the electricity service distributor for the City [], including for the Property." (Doc. No. 31 at p. 7, ¶ 10).

[5] The aforementioned letter stated the following:

GDC's power needs at the potential site of its data center." (*Id.* at p. 7, ¶ 13). On June 16, 2022, in reliance on that promise, GDC purchased from the City "a parcel of land located in the Gallatin Industrial Center," with the address of 1386 Gateway Drive, Gallatin, Tennessee (the "Property"). (*Id.* at p. 8, ¶¶ 14 and 16). A deed effecting (and reflecting) GDC's purchase of the Property is "recorded in Deed Book 5984 page 342, Register's Office for Sumner County, Tennessee" ("Warranty Deed"). (*Id.* at p. 8, ¶ 14).

### B. Provisions Related to the City's Right to Repurchase the Property

There are two provisions that discuss the City's right to repurchase the Property. One can be found in the Restrictive Covenants and the other in the Warranty Deed. (Doc. No. 31 at pp. 8-9, ¶ 17; *id* at p. 2, ¶ 5; Doc. No. 1-1 at ¶ 5). The relevant provision in the "Restrictive Covenants" states the following:

**RECAPTURE**

A. If after twelve (12) months have expired from the sooner of:

---

Gallatin Department of Electricity (GDE) will be able to serve the electric load at your data center located in the Gallatin Industrial Park off Airport Road in Gallatin, Tennessee. It is our understanding that your initial electric load will be around 5MW and could grow to 25MW within 5 years and have the potential to double that load for a total of 50MW. A schedule of your anticipated ramp-up in load would be valuable.

The new Industrial Substation that is located beside the proposed data center site has been energized and is serving load within the Industrial Park. The current capacity of the Substation is 50MVA with a current load of around 5MW. There are two 25MVA transformers that are operated independently. This Substation has been configured to add a third transformer which could bring the station capacity to 75MVA, and GDE has reserved City owned land for a potential forth bay that would bring the capacity to 100MVA. GDE should be able to handle any future needs that you would have at this site. There will be opportunity for backup power from different station transformers and potential underground feeds to the data center.

TVA is prepared to serve the 50MW load of our new station, but any increase in capacity would need to be cleared with TVA Transmission Services. We may be ok but would still need to go through the process.

(Doc. No. 31 at pp. 7-8, ¶ 13).

1. the date of execution and delivery of any deed by the City to any site in the Gallatin Industrial Center, Phase II or the date that possession of such site is granted to a user; and

2. *the owner or use of such site has not, in good faith, begun construction of a building thereon as approved by the City*, then the City has the option and privilege of either:

   a. repurchasing that site from the owner thereof at the same price paid to the City for same or;

   b. terminating the user's occupancy of said site, as appropriate.

B. The option of the City to repurchase continues for a period of one year from the end of the twelve (12) month period. The option shall be deemed exercised by a notice in writing to said owner delivered within the aforementioned period.

(Doc. No. 31 at p. 2, ¶ 5; Doc. No. 1-1 at ¶ 5 (emphasis added)).[6] Importantly, the Warranty Deed clarified that the Property was being sold to GDC subject to the Restrictive Covenants. (Doc. No. 31 at p. 2, ¶ 6; Doc. No. 1-1 at ¶ 6).

The second provision that concerns the City's right to repurchase the Property comes from the Warranty Deed and states the following:

Subject to any and all plats, easements, restrictions, and other matters of record, including, but not limited to, the following:

. . .

4. Restrictions as recorded in Record Book 3912, Page 566, Register's Office for Sumner County, Tennessee.
NOTE: Grantor retains the right to repurchase the Optional Premises, at the original purchase price, if development of the Optioned Premises has not commenced on or before the date that is one (1) year after the date of acquisition of the Optioned Premises by Grantee. . . .

---

[6] As is readily apparent, the aforementioned language makes no sense as it is structured. Because of the colon placement in "A.," "2." should contain an event (or date) that could be the "sooner" time referred to in "A."; the sole options for the "sooner" time should *not* all be in "1.," because the colon placement unambiguously suggests that "2." would contain an option (or options) for a "sooner" event or date.

(Doc. No. 31 at pp. 8-9, ¶ 17).[7] In relevant part, "[t]he 'date of acquisition of the Optioned Premises' by GDC was June 16, 2022." (*Id.* at p. 9, ¶ 18).

Notably, "[t]he City's own zoning ordinance (Section 10.03.041) defines 'development' to mean 'any man-made change to improved or unimproved real estate, including, but not limited to, buildings or other structures, mining, dredging, filling, grading, paving, excavating, drilling operations, or permanent storage of equipment or materials.'" (*Id.* at p. 12, ¶ 37).

### C.      GDC's Development of the Property

"Immediately after GDC purchased the Property, it began making significant efforts to develop the Property." (*Id.* at p. 9, ¶ 22). One of the first steps in building its data center "was to ensure that there would be power to the Property." (*Id.* at p. 9, ¶ 23). Beginning in June 2022, GDC took the following measures:

> worked with the Gallatin Department of Electricity, the TVA, and various vendors to get power to and develop the Property by, for example, working to procure the necessary equipment for delivering power (*e.g.*, padmount transformers and Vista switches), exploring renewable energy options, working on the electrical design, designing the data center itself, negotiating a power contract with the Gallatin Department of Electricity, conducting due diligence on requirements for constructing a building on the Property, and marketing its future data center to potential customers.

(*Id.* at pp. 9-10, ¶ 24). In or around October 2022, GDC "entered into a Power Contract with 'the City of Gallatin, Department of Electricity'" requiring the "'the City of Gallatin, Department of Electricity to provide, *inter alia*, certain equipment and services related to providing power to the Property" ("Power Contact"). (*Id.* at p. 10, ¶ 25). In January 2023, the City invoiced GDC for the

---

[7] Again, the drafting of the aforementioned language is odd (and indeed very poor). Proceeding here by way of a "NOTE" strikes the Court as fostering confusion, not least because it simply does not flow from the colon/numeration structure wherein it is found. Ultimately, however, the lack of clarity engendered by the use of a "NOTE" here does not affect the Court's ultimate conclusion when ruling on the Motion.

Power Contract, and on February 2, 2023, GDC paid the invoice in the total amount of $1,269,262.26. (*Id.* at p. 10, ¶ 26).

GDC also engaged in grading the Property—"a necessary and integral step in the construction process, . . . one of the first steps in beginning construction of a building is to grade the land." (*Id.* at p. 10, ¶ 28). On May 10, 2023, GDC's "grading contractor submitted an application for the land disturbance (grading) permit for the Property." (*Id.* at p. 10, ¶ 27). On May 30, 2023, "the City approved the grading to commence," (*id.* at p. 10, ¶ 29), and the City officially issued the grading permit[8] on June 13, 2023 (*id.* at p. 10, ¶ 30). "On June 15, 2023, . . . the construction grading was substantially complete." (*Id.* at p. 10, ¶ 31).

GDC took numerous other steps to further develop the Property, including the following:

(i) progress towards the design and power for the campus, with associated costs of around $1.7 million; (ii) commit[ting of] expenses totaling over $31 million for equipment on order for the Property and related lot, including ordering transformers and VISTA gear; and (iii) a signed letter of agreement with a large customer to buildout and occupy the data centers on the campus.

(*Id.* at p. 11, ¶ 35). The City's and the Gallatin Department of Electricity's failure to timely apprise GDC "that supplying the requisite power to the Property would be a long, arduous process rife with delays due to issues," (*id.* at p. 9, ¶ 19), has "hampered GDC's efforts to develop the Property" (*id.* at p. 9, ¶ 21).

**D.      The City's Attempt to Assert its Alleged Right of Repurchase**

On or around January 10, 2024, GDC "received an unsigned and undated Notice of Exercise of the Right to Repurchase the Property wherein the City purported to exercise its repurchase rights under the Deed ('Notice') because 'development of the Property did not commence by the first anniversary of the date of the [Warranty] Deed.'" (*Id.* at pp 11-12, ¶ 36).

---

[8] When the Court refers to the "grading permit," it is referring to "the Land Disturbance Permit, Permit No. ELDP-2023-0216, which permitted the grading to proceed." (Doc. No. 31 at p. 10, ¶ 30).

On January 26, 2024, GDC "responded to the City's purported Notice explaining that the City's purported repurchase was ineffective." (*Id.* at p. 12, ¶ 40). On January 30, 2024, the City responded, asserting "that the grading work was to support additional work on Lot 2, and therefore, did not constitute development of Lot 1." (*Id.* at p. 12, ¶ 41). "On January 31, 2024, GDC responded to the January 30 letter explaining, among other things, that the Deed does not specify the type of development on Lot 1 that must commence prior to the one-year deadline." (*Id.* at p. 13, ¶ 42).

After the January correspondence, the City scheduled a call with GDC to address the dispute. (*Id.* at p. 13, ¶ 43). "The Gallatin Economic Development Agency represented the City on the February 8, 2024 call." (*Id.*). "During the call, the Agency conceded that the City did not have the right to repurchase the Property, and the parties engaged in a discussion concerning obtaining power and further development by GDC for the Property going forward." (*Id.*). Ultimately, "[i]n reliance on the City's representation that it did not have the right to repurchase the Property, GDC proceeded with its efforts to develop the Property." (*Id.* at p. 13, ¶ 46). Specifically, GDC "emailed the Gallatin Department of Electricity on February 12, 2024: 'We are full speed ahead on this build in Gallatin.'" (*Id.*).

<u>PROCEDURAL HISTORY</u>

On or about June 17, 2024, the City filed its Complaint (Doc. No. 1-1, "Complaint") in the Chancery Court for the State of Tennessee, Sumner County, therein seeking an order for specific performance that would require GDC to convey the Property back to the City. (Doc. No. 1-1 at ¶ 17). On July 17, 2024, GDC timely removed the case to federal court by filing a notice of removal (Doc. No. 1). On August 23, 2024, GDC filed an answer in response to the Complaint (Doc. No.

7 at 1-5, "GDC's Answer"), and GDC and PDC[9] together filed three counterclaims (*id.* at 6-14, "Counterclaims") against the City: (1) a request for a declaratory judgment ("Counterclaim 1"), (2) a claim for unjust enrichment ("Counterclaim 2"), and (3) a claim for breach of contract "Counterclaim 3"). (*Id.*). Thereafter, the City filed its Answer to the Counterclaims (Doc. No. 8).

The City's first motion for judgment on the pleadings (Doc. No. 17) was mooted by the supplemental filing of GDC's Answer and an amended version of Counter-Plaintiffs' Counterclaims (Doc. No. 31, "GDC's Answer and Counter-Plaintiffs' Amended Counterclaims"). Notably, the Counter-Plaintiffs' Amended Counterclaims added Gallatin Department of Electricity as a Counter-Defendant. (*Id.*). Gallatin Department of Electricity (Doc. No. 32) and the City (Doc. No. 33) each filed an answer to Counter-Plaintiffs' Amended Counterclaims.

On May 28, 2025, the City filed the instant Motion, therein seeking judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), asserting that as a matter of law, it is entitled to specific performance (via its own claim) requiring GDC to convey the Property to the City, and dismissal of Counterclaim 1, Counterclaim 2, and Counterclaim 3.

LEGAL STANDARD

The Federal Rules of Civil Procedure provide that after the pleadings are closed, but within such time as not to delay the trial, any party may move for judgment on the pleadings. Fed. R. Civ. P. 12(c). "For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true[.]" *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007) (quoting *Southern Ohio Bank v. Merrill Lynch,*

---

[9] PDC "is a corporate affiliate of GDC." (Doc. No. 31 at p. 6, ¶ 2). In the Counterclaims, GDC and PDC are treated as one entity, inasmuch as the Counterclaims state that "[PDC] and GDC are collectively referred to herein as 'GDC.'" (*Id.*). Although the Counterclaims refer to PDC and GDC collectively as "GDC," the Court declines to nominally collapse one of these entities into the other and thus will continue to refer to PDC and GDC collectively as the "Counter-Plaintiffs"

*Pierce, Fenner & Smith, Inc.,* 479 F.2d 478, 480 (6th Cir. 1973)); *see also Bickley v. Dish Network, LLC*, 751 F.3d 724, 733 (6th Cir. 2014) ("In assessing the pleadings, we take as true 'all well-pleaded material allegations.'" (quoting *United States v. Moriarty,* 8 F.3d 329, 332 (6th Cir. 1993))). However, the Court "need not accept as true legal conclusions or unwarranted factual inferences." *Mixon v. Ohio,* 193 F.3d 389, 400 (6th Cir. 1999) (citing *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987)). Importantly, in ruling on a motion for judgment on the pleadings, a court should "draw all reasonable inferences from the relevant record in favor of the non-movant." *Lavado v. Keohane*, 992 F.2d 601, 605 (6th Cir. 1993). *Accord Zawlocki v. Rama Tech, LLC*, No. 03-60159, 2005 WL 3358855, at *2 (E.D. Mich. Dec. 9, 2005) ("In evaluating a Rule 12(c) motion for judgment on the pleadings, 'the court must view the pleadings in the light most favorable to, and draw all inferences in favor of, the nonmoving party.'" (quoting *Madonna v. United States*, 878 F.2d 62, 65 (2d Cir. 1989))).

Rule 12(c) clearly indicates that it can be used by both sides in a lawsuit—i.e., by both plaintiffs and defendants. Fed. R. Civ. P. 12(c) ("After the pleadings are closed—but early enough not to delay trial—*a party* may move for judgment on the pleadings." (emphasis added)). When a defendant makes a motion pursuant to Rule 12(c), the defendant is challenging the sufficiency of the plaintiff's complaint. *Rhoades v. Hameed*, No. 1:08-CV-1445, 2009 WL 10720170, at *5 (N.D. Ohio Sept. 30, 2009) ("The purpose of Rule 12(c) . . . is to challenge the sufficiency of the plaintiff's complaint." (citing *Morgan*, 829 F.2d at 11)). Rule 12(c) may be employed by a defendant "as a vehicle for raising several of the defenses enumerated in Rule 12(b), including the defense of failure to state a claim upon which relief may be granted." *Amersbach v. City of Cleveland*, 598 F.2d 1033, 1038 (6th Cir. 1979). *Accord Thomason v. Nachtrieb*, 888 F.2d 1202,

1204 (7th Cir. 1989) (citing *Amersbach*); *Becker v. Crounse Corp.*, 822 F. Supp. 386, 391 n.4 (W.D. Ky. 1993) (citing *Amersbach*).

When that defense is raised via a motion for judgment on the pleadings, the district court evaluates the motion using the same standard applied to a motion to dismiss for failure to state a claim under Rule 12(b)(6). *See Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 n.1 (6th Cir. 1988); *Becker*, 822 F. Supp. at 391 n.4 (W.D. Ky. 1993) (citing *Amersbach*); *Kinney v. Mohr*, No. 2:13-cv-1229, 2017 WL 1395623, at *4 (S.D. Ohio Apr. 19, 2017) (citing *Amersbach*); *Clemons v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, No. 3-14-1690, 2015 WL 4717398, at *1 (M.D. Tenn. Aug. 7, 2015). Thus, "[t]he same rules which apply to judging the sufficiency of the pleadings apply to a Rule 12(c) motion as to a motion filed under Rule 12(b)(6)[.]" *Lacy v. Ohio Dept. of Job and Family Servs.*, No. 2:16-cv-912, 2017 WL 1397522, at *1 (S.D. Ohio Apr. 19, 2017). Indeed, when a Rule 12(c) motion is based on an asserted failure to state claim upon which relief can be granted, "[t]he only difference between Rule 12(c) and Rule 12(b)(6) is the timing of the motion to dismiss." *Ruppe v. Knox Cnty. Bd. Of Educ.*, 993 F. Supp.2d 807, 809 (E.D. Tenn. 2014) (quoting *Hunter v. Ohio Veterans Home*, 272 F. Supp. 2d 692, 694 (N.D. Ohio 2003)).

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and their progeny provide the applicable standard for motions to dismiss for failure to state a claim under Rule 12(b)(6). For purposes of a motion to dismiss, the Court must take all of the factual allegations in the complaint as true. *Iqbal*, 556 U.S. at 678. To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Id*. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. When there are well-pleaded factual allegations, a court should assume their veracity

and then determine whether they plausibly give rise to an entitlement to relief. *Id*. at 679. A legal conclusion, including one couched as a factual allegation, need not be accepted as true on a motion to dismiss, nor are mere recitations of the elements of a cause of action sufficient. *Id*. at 678; *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010); *Abriq v. Hall*, 295 F. Supp. 3d 874, 877 (M.D. Tenn. 2018).

Consistent with these principles, the Sixth Circuit has noted that "[t]o survive a Rule 12(c) motion, 'a complaint must contain direct or inferential allegations respecting all the material elements under some viable legal theory.'" *Hindel v. Husted*, 875 F.3d 344, 346-47 (6th Cir. 2017) (quoting *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007)).

Conversely, when a *plaintiff* makes a motion pursuant to Rule 12(c), the plaintiff is asserting not that dismissal is proper, but instead that no dispute of material fact exists that should prevent the Court from immediately awarding the plaintiff's desired relief.[10] *Cf JPMorgan Chase Bank, N.A.*, 510 F.3d at 582 ("A Rule 12(c) motion 'is granted when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law.'" (quoting *Paskvan v. City of Cleveland Civil Serv. Comm'n,* 946 F.2d 1233, 1235 (6th Cir. 1991)). The Sixth Circuit clarified that when a plaintiff files a Rule 12(c) motion, the analysis looks different than when a defendant files such a motion, stating the following:

> instead of asking whether the "complaint . . . contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (citation omitted), we ask "whether the plaintiff's petition, stripped of those allegations which are denied by the defendant's answer, would leave the petition stating a cause of action against the defendant." 61A Am. Jur. 2d Pleading § 497; see also *Bass v. Hoagland*, 172 F.2d 205, 207 (5th Cir. 1949) ("[T]he fact allegations of the answer are to be taken as true, but those of the complaint are taken as true only where and to the extent that they do not conflict with those of the answer.").

---

[10] The Court is aware that this sounds like the standard for a motion for *summary judgment* under Rule *56*. Nevertheless, this is indeed an accurate description of how the standard functions when the plaintiff, rather than the defendant, moves for judgment on the pleadings.

*United Food & Com. Workers, Loc. 1995 v. Kroger Co.*, 51 F.4th 197, 202 (6th Cir. 2022). Put another way, by virtue of filing a Rule 12(c) motion for judgment on the pleadings, a plaintiff is essentially challenging the sufficiency of the defendant's answer, alleging that even if all factual allegations in the defendant's answer are true, the answer is still legally insufficient to challenge the plaintiff's legal entitlement to the relief sought.

So, when a plaintiff moves for judgment on the pleadings, all well-pleaded material allegations in the defendant's answer must be taken as true. *See JPMorgan Chase Bank, N.A.*, 510 F.3d at 581 ("For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true[.]" (quoting *Southern Ohio Bank,* 479 F.2d at 480)). As the Sixth Circuit explained, "[a]fter we accept the answer's well-pleaded allegations as true and construe the pleadings and exhibits in a light most favorable to the defendant, 'the motion may be granted only if the [plaintiff] is nevertheless clearly entitled to judgment.'" *United Food & Com. Workers, Loc.* 1995, 51 F.4th at 202 (quoting *S. Ohio Bank v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 479 F.2d 478, 480 (6th Cir. 1973)).

Rule 12(d) states, "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). So as a general rule, if matters outside the pleadings are presented on a Rule 12(c) motion and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. Fed. R. Civ. P. 12(d); *Max Arnold & Sons, LLC v. W.L. Hailey & Co.*, 452 F.3d 494, 503 (6th Cir. 2006) ("Because Plaintiff presented matters outside of the pleadings with respect to Defendant's Rule 12(c) motion, and because the district court did not exclude these matters, the district court should have converted

the Rule 12(c) motion to a motion for summary judgment."). However, "[u]nder a well-established exception to Rule 12(d), courts may consider documents attached to a Rule 12(b)(6) or 12(c) motion without converting either into a summary-judgment motion if the attached materials are: (i) 'referred to in the plaintiff's complaint and are central to [the] claims' or (ii) 'matters of public record.'" *Kassem v. Ocwen Loan Servicing, LLC*, 704 F. App'x 429, 432 (6th Cir. 2017) (quoting *McLaughlin v. CNX Gas Co., LLC*, 639 F. App'x. 296, 298-99 (6th Cir. 2016)). *Accord Greenberg v. Life Ins. Co. of Virginia*, 177 F.3d 507, 514 (6th Cir. 1999).

In the present case, because the City (i.e., Plaintiff/Counter-Defendant) is the movant,[11] the Court will take the well-pleaded factual allegations made in GDC's Answer and Counter-Plaintiffs' Amended Counterclaims as true for purposes of the Motion.

<u>DISCUSSION</u>

The City asserts that it is "entitled to judgment on the pleadings" as to both (i) "its claim for specific performance," (Doc. No. 34 at 5) and (ii) "[Counter-Plaintiffs'] counterclaims" (*id.* at 10). The Court will analyze each assertion in turn.

## I. The City's Claim for Specific Performance

In assessing whether the City is entitled to judgment on the pleadings as to its claim for specific performance, the underlying question of consequence is whether—at the time that the City

---

[11] Notably, although the City is the "movant" for purposes of each form of relief sought in the Motion, the City does not necessarily qualify as a "plaintiff movant" as to each. As it relates to the portion of the Motion wherein the City moves the Court for judgment on the pleadings as to its claim for specific performance, the City would clearly qualify as a "plaintiff movant." However, as it relates to the portion of the Motion wherein the City seeks dismissal of the Counterclaims, the City shifts into the role of a "defendant movant" because there the City requests dismissal of claims brought *against* it by Counter-Plaintiffs as opposed to claims it brought.

Although the City shifting from "plaintiff movant" to "defendant movant" may affect the framing of the standard, it does not affect the Court taking the well-pleaded factual allegations made in GDC's Answer and Counter-Plaintiffs' Amended Counterclaims as true and drawing all reasonable inferences in favor of Counter-Plaintiffs; this is because (as indicated above) so doing is required both when the City is acting as a "plaintiff movant" *and* when the City is acting as a "defendant movant."

tried to exercise its right to repurchase the Property—the City had the right to repurchase the Property. That question, in turn, depends on when and under what circumstances the City's right to repurchase the Property may become extinguished.

As discussed above, there appear to be two provisions of relevance in analyzing when the City's right to repurchase may become extinguished. (Doc. No. 31 at pp. 8-9, ¶ 17; *id* at p. 2, ¶ 5; Doc. No. 1-1 at ¶ 5). First, the Restrictive Covenants have a provision entitled "RECAPTURE" that states that the City has a right to repurchase the Property if "the owner or use of such site has not, in good faith, *begun construction of a building* thereon as approved by the City" ("Restrictive Covenants Provision"). (Doc. No. 31 at p. 2, ¶ 5; Doc. No. 1-1 at ¶ 5 (emphasis added)). Second, the Warranty Deed states that the sale of the Property is subject to all restrictions, including "[r]estrictions as recorded in Record Book 3912, Page 566, Register's Office for Sumner County, Tennessee"; however, directly below this provision is a note stating that the City retains a right to repurchase the Property "*if development* of the Optioned Premises has not commenced on or before the date that is one (1) year after the date of acquisition of the Optioned Premises by Grantee" ("Warranty Deed Provision"). (Doc. No. 31 at pp. 8-9, ¶ 17 (emphasis added)) (hereinafter the Court refers to the "Restrictive Covenants Provision" and the "Warranty Deed Provision" collectively as the "Provisions").

Under the City's interpretation of the Provisions ("City's Interpretation"), the Restrictive Covenants Provision and the Warranty Deed Provision create separate, independent rights of repurchase. (Doc. No. 34 at 3-4). It follows that under the City's Interpretation, the City retains its right to repurchase the Property *at least* until such right expires under the Restrictive Covenants Provision—which occurs when GDC "begin[s] construction of a building" on the Property—even if the right to repurchase the property specifically under the *Warranty Deed Provision* expired

earlier. So, the City asserts that to extinguish the City's right to repurchase that was created by the Restrictive Covenants Provision, GDC was required to "begin constructing a building." (*Id.* at 4). The City argues that it exercised its right to repurchase the Property before GDC began constructing a building, and that therefore—in accordance with the City's Interpretation—the City at that time still possessed the right to repurchase the Property.

Conversely, under Counter-Plaintiffs' interpretation of the Provisions ("Counter-Plaintiffs' Interpretation"), the City's right to repurchase the Property is extinguished once GDC begins *any* development activity on the Property, even if such development does not constitute "construction of a building." (Doc. No. 36 at 12). In support of this interpretation, Counter-Plaintiffs provide two arguments. First, Counter-Plaintiffs assert that the Restrictive Covenants Provision and the Warranty Deed Provision "must be and may be easily read together harmoniously, *i.e.*, if GDC engages in any 'development' activity, including but not limited to beginning to construct a building, the City's repurchase rights are eliminated." (*Id.*). Second, Counter-Plaintiffs assert that "[t]o the extent this Court concludes the two provisions may not be read together, . . . the Court should find that the Parties modified and narrowed the City's repurchase right in the Restrictive Covenants by agreeing that any type of 'development' to the site would negate the City's repurchase right." (*Id.*).

Counter-Plaintiffs argue alternatively that they should prevail even if the Court declines to adopt Counter-Plaintiffs' Interpretation. That is, they argue that "even if the Court were to accept the City's [I]interpretation . . ., the work that GDC [performed] on the Property [prior to the City asserting a right to repurchase the Property] qualifies as beginning construction of a building." (*Id.* at 14).[12]

---

[12] In their Response, Counter-Plaintiffs go on to provide two additional arguments in support of their position that the City is not entitled to judgment on the pleadings as to the City's claim for specific

At the present stage, as discussed below, the Court finds that irrespective of whether the City's Interpretation or Counter-Plaintiffs' Interpretation ultimately prevails, the City is not entitled to judgment on the pleadings as to its claim for specific performance. Thus, in deciding the Motion with respect to the City's claim for specific performance, the Court need not—and will not—decide which interpretation likely will ultimately prevail.

Assuming *arguendo* the correctness of the City's Interpretation—i.e., that the City's right to repurchase the Property endures until GDC "begin[s] construction of a building" on the Property (Doc. No. 34 at 3-4)—the City still would not be entitled to judgment on the pleadings as to its claim for specific performance. In line with the City's desired interpretation of the Provisions, the City's right to repurchase the Property would become extinguished once GDC began construction of a building on the Property. In their Response, Counter-Plaintiffs assert that the City's right to repurchase the Property was extinguished because "even if the Court were to accept the City's interpretation of the Warranty Deed (it should not), the work that GDC has done on the Property qualifies as beginning construction of a building." (Doc. No. 36 at 14). More specifically, Counter-Plaintiffs assert that the grading of the Property—which was substantially complete by June 15, 2023 (Doc. No. 31 at p. 10, ¶ 31)—qualifies as "beginning construction of a building," meaning that at the time the City attempted to exercise its right to repurchase the Property—i.e., January 10, 2024 (Doc. No. 31 at pp. 11-12, ¶ 36)—such right had already become extinguished even under the City's Interpretation. The Court agrees.

---

performance. First, Counter-Plaintiffs alternatively argue that "the Court should deny the City's Motion because the seemingly conflicting language of the [Warranty Deed Provision] and the Restrictive Covenants [Provision] render the Warranty Deed ambiguous." (Doc. No. 36 at 15). Second, Counter-Plaintiffs further assert that its "[a]ffirmative [d]efenses [a]lso [c]reate an [i]ssue of [f]act [w]ith [r]espect to the City's [c]laim for [s]pecific [p]erformance." (*Id.* at 16). Ultimately, finding it proper to deny the Motion—as to the claim for specific performance—on other grounds, the Court declines to analyze these alternative arguments.

Importantly, and as discussed above, on a motion for judgment on the pleadings, the Court must accept the nonmovants well-pleaded material allegations as true for purposes of the motion and the Court must construe the pleadings in a light most favorable to the nonmoving party. *Cf United Food & Com. Workers, Loc. 1995*, 51 F.4th at 202; *JPMorgan Chase Bank, N.A.*, 510 F.3d at 581. Although the City contends that GDC did not begin construction of a building on the Property before the City attempted to exercise its right to repurchase the Property, accepting Counter-Plaintiffs' factual allegations and construing the pleadings in the light most favorable to the Counter-Plaintiffs, the Court finds that GDC had because the developments GDC alleges to have made to the Property[13] would qualify as beginning construction of a building on the Property.

Of consequence in answering whether Counter-Plaintiffs "beg[an] construction of a building" (Doc. No. 34 at 3-4) is the meaning of the word "construction." As the City itself admits, courts "should interpret . . . contract[s] according to [their] plain meaning." (Doc. No. 40 at 4 (quoting *Castro v. Fire Door Solutions, LLC*, 542 F. Supp. 3d 771, 776 (M.D. Tenn. 2021)). More specifically, in interpreting contracts, courts are to give particular terms in the contract their plain meaning unless the contract itself suggests doing otherwise. *Cf Bolson Materials Int'l, Inc. v. 3d Sys. Corp.*, No. 5:14CV01441, 2016 WL 5661613, at *3 (N.D. Ohio Sept. 30, 2016) ("To interpret a contract, a court must look to the plain and ordinary meaning of the language used in the contract

---

[13] In its Reply, the City argues that "the alleged grading applied to a lot that is not the subject of this action." (Doc. No. 40 at 1). This assertion is not only arguably a new argument asserted for the first time in the Reply that the Court need not consider, but appears to create a dispute of material fact because Counter-Plaintiffs specifically allege that they graded the Property that is the subject of this litigation (Doc. No. 31 at pp. 9-10. ¶¶ 27-30). Notably, it is improper to grant a motion for judgment on the pleadings if there is a dispute of material fact, *JPMorgan Chase Bank, N.A.*, 510 F.3d at 582, and so this argument provides support not for granting, but rather for denying, the Motion.

It goes almost without saying that at a later stage the City will have the opportunity to challenge Counter-Plaintiffs' assertion that it developed and graded the Property before the City attempted to exercise its right to repurchase the Property. But at the present stage, the Court must accept as true the non-movant's factual assertions—including that it developed and graded the Property.

unless another meaning is clearly apparent from the contents of the agreement.") (internal citations and quotations omitted)). In the present case, because the Court perceives nothing in the Restrictive Covenants to suggest how to interpret the phrase "begin construction of a building," the Court will interpret such in accordance with the plain meaning of the words therein.

According to Merriam-Webster Dictionary, the word "construction" means "the *process*, art, or manner of *constructing* something." *Construction*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/construction (emphasis added).[14] From such definition, the definition of the word "constructing" becomes important. Merriam-Webster Dictionary defines "construct"—and by extension "constructing"—as "to make or form by combining or arranging parts or elements." *Construct*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/construct. In line with the plain meaning of the words "construction," and "constructing," the Court finds that "construction of a building" can be said to have begun when "the *process* . . . of making or forming" a building began. Notably, at the

[14] The Court will briefly address the City's assertion that plain meaning of the phrase "construction of a building" "would require erection of a structure to satisfy the condition." (Doc. No. 40 at 4 (citing *Construction*, *Oxford English Dictionary* (2d ed. 1989) ("erection building"))). Importantly, the City's cited definition of the word "construction" does not support its ultimate conclusion.
    As a preliminary matter, the Court will briefly address the City's attachment of exhibit 4 (Doc. No. 40-4. "Exhibit 4") to its Reply. As discussed above, the Court will not consider the Exhibits when ruling on the Motion (*supra* p. 2 n.1), but the Court still wishes to briefly address why Exhibit 4 is misleading. Exhibit 4 is a screenshot of the Oxford English Dictionary webpage. More specifically, Exhibit 4 is a screenshot of the search results for the word "construction." Importantly, that page is not the page with definitions of the word "construction," instead one must click the "View Entry" link to gain access to Oxford English Dictionary's official definitions of the word "construction."
    The Court took it upon itself to survey Oxford English Dictionary's multiple definitions of the word "construction." The Court found the following definition to be of relevance in this particular context: "[t]he action or process of constructing, building, assembling, or making something, or of causing something to be constructed or made." *Construction*, Oxford English Dictionary, https://www.oed.com/dictionary/construction_n?tab=meaning_and_use#8400370. Notably, this definition is quite analogous to the Merriam-Webster definition of the word "construction," as both indicate that the word "construction" relates to the process of constructing something. Therefore, although the City argues that there must exist an "erection of a structure," the Court disagrees, finding that the plan meaning of the word "construction" does not support the assertion that there must exist an erection of a structure.

time the City attempted to exercise a right of repurchase GDC had already engaged in grading the Property, which—according to Counter-Plaintiffs—is "a necessary and integral step in the construction process." (Doc. No. 31 at p. 10, ¶ 28). At the present stage, wherein the Court must construe the pleadings in a light most favorable to the nonmoving party and accept the nonmovants well-pleaded material allegations as true for purposes of the motion, *United Food & Com. Workers, Loc. 1995*, 51 F.4th at 202, the Court finds that grading qualifies as part of the process of making or forming a building. So, the Court finds it logical to conclude that at the time GDC began grading the Property, GDC had begun construction of a building.

In sum, even if the Court were to adopt the City's Interpretation,[15] the Court would nonetheless conclude that the City's right to repurchase was extinguished once GDC graded the Property, which—as discussed above—occurred before the City attempted to exercise its right to repurchase the Property.[16] Therefore, the Court finds that the City is not entitled to specific performance as a matter of law. So the Court denies the Motion as it relates to the City's request for specific performance.

---

[15] Although the Court focuses the majority of its analysis on why the City's Motion would fail even if the City's Interpretation were to prevail, the Court will briefly address why the Motion likewise would fail if instead Counter-Plaintiffs' Interpretation ultimately prevails. Under Counter-Plaintiffs' Interpretation, the City's right to repurchase the Property becomes extinguished when Counter-Plaintiffs begin any development activity on the Property. As discussed above, Counter-Plaintiffs alleged that they graded the Property, which in the Court's view is an allegation that (construed in Counter-Plaintiffs favor as required) would plausibly suggest "development" of property. Therefore, if Counter-Plaintiffs' Interpretation, rather than the City's Interpretation, ultimately prevails, the result is still the same: the City's right to repurchase became extinguished once Counter-Plaintiffs graded the Property, which—as discussed above—occurred before the City attempted to exercise its right to repurchase the Property.

[16] The City makes multiple arguments for why Counter-Plaintiffs' Interpretation is improper and should not be adopted by the Court. Because the Court reaches its conclusion by assuming—for purposes of ruling on the Motion—to the City's benefit that the City's Interpretation (rather than Counter-Plaintiffs' Interpretation) governs, the Court declines to address such arguments.

## II.     Counter-Plaintiffs' Counterclaims

The City asserts that it is "entitled to judgment on the pleadings as to [Counter-Plaintiffs'] counterclaims."[17] (Doc. No. 34 at 10). As discussed above, Counter-Plaintiffs filed three counterclaims against the City: (1) a request for a declaratory judgment (i.e., Counterclaim 1), (2) a claim for unjust enrichment (i.e., Counterclaim 2), and (3) a claim for breach of contract (i.e., Counterclaim 3). (Doc. No. 31 at pp. 6-22). The City seeks dismissal of all three.

As it relates to Counterclaim 1, the City appears to proffer no argument for dismissal apart from its assertion that it is entitled to judgment on the pleadings as to its claim for specific performance. (Doc. No. 34 at 10). However, in light of the Court's decision that the City is not entitled to judgment on the pleadings as to its claim for specific performance, that assertion fails to justify dismissal of Counterclaim 1. So the Court will deny the Motion as it relates to Counterclaim 1.

Regarding Counterclaim 2 and Counterclaim 3, the City argues that it "is entitled to judgment on the pleadings because . . . they are directed against the Gallatin Department of Electricity, an entity distinct from [the City.]" (Doc. No. 34 at 10). First, the Court finds that Counterclaim 2 is properly directed against the City. Counter-Plaintiffs emphasize in their Response that its "unjust enrichment claim alleges that if the City is entitled to exercise the right to repurchase the Property, it will be unjustly enriched because GDC improved the Property by

---

[17] Notably, as to this portion of the Motion, wherein the City requests dismissal of the Counterclaims, the City takes on the role of a "defendant movant." Put another way, as it relates to the Counterclaims, the Counter-Plaintiffs assume the role of a plaintiff and the City therefore is shifted into the position of a defendant. So, as discussed above, when analyzing this portion of the Motion, the Court will evaluate such using the same standard applied to a motion to dismiss for failure to state a claim under Rule 12(b)(6). But as previously emphasized, even with the City shifting from a "plaintiff movant" to a "defendant movant," the Court will continue to take as true the well-pleaded factual allegations made in GDC's Answer and Counter-Plaintiffs' Amended Counterclaims and to construe the pleadings in the light most favorable to Counter-Plaintiffs as the non-movant. (*See supra* p. 14 n.11).

grading it." (Doc. No. 36 at 19). In other words, it would be the City (as the repurchaser of the Property) and not Gallatin Department of Electricity that would benefit from GDC's improvements to the Property. Notably, the City fails to provide a response to this assertion in its Reply. (Doc. No. 40). The Court finds that by alleging that they graded the Property, Counter-Plaintiffs have alleged factual matter plausibly suggesting that the City (as opposed to Gallatin Department of Electricity) would be unjustly enriched if it was ultimately permitted to exercise the right to repurchase the Property. Therefore, the Court will deny the City judgment on the pleadings as to Counterclaim 2.

That leaves Counterclaim 3. Although the City asserts that it is entitled to judgment on Counterclaim 3, arguing that the Gallatin Department of Electricity is an entity separate from the City, Counter-Plaintiffs assert that "the City has failed to establish it[self as] a separate entity from the Gallatin Department of Electricity." (Doc. No. 36 at 20). More specifically, Counter-Plaintiffs assert that whether the City and the Gallatin Department of Electricity are separate entities "is a question of fact" that makes judgment on the pleadings improper. (*Id.*). In reviewing the Motion and the Response, the Court finds that there is a question of fact regarding whether the City and the Gallatin Department of Electricity are one entity or separate entities.

Arguing that they are separate entities, the City states, "Gallatin Department of Electricity is operated and governed by an Electric Power Board established under the Municipal Electric Plant Law of 1935. GALLATIN, TENN., CODE OF ORDINANCES SEC. 17-286." (Doc. No. 34 at 10). Conversely, Counter-Plaintiffs assert that there is a question of fact regarding whether the Gallatin Department of Electricity and the City are one entity or separate entities because "the City's Charter s[t]ates that providing electricity is within the powers of the City, the City's own website states the mayor directs the Gallatin Department of Electricity's operations, and the City

has failed to explain how the pleadings or its cited ordinance support its position." (Doc. No. 36 at 21). From the arguments presented in the Motion and the Response, the Court finds there is a question of fact regarding whether the Gallatin Department of Electricity and the City are one entity or separate entities, making judgment on the pleadings improper.[18] So the Court will deny the Motion as it relates to Counterclaim 3.

<u>CONCLUSION</u>

For the reasons indicated herein, the Court will **DENY** the City's renewed motion for judgment on the pleadings (Doc. No. 34) in its entirety.

An appropriate corresponding order will be entered.

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE

---

[18] It goes almost without saying that whether the Gallatin Department of Electricity and the City are one entity or separate entities could be put to the test at later stages of litigation. Discovery can, and likely will, shed light on whether the Gallatin Department of Electricity and the City are one entity or separate entities. However, because there is a question of fact surrounding the answer to that question, judgment on the pleadings is currently improper as to Counterclaim 3.